UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

AT&T CORPORATION,

        Plaintiff,

        v.                                                   Case No. 06-CV-249

MIDWEST PARALEGAL SERVICES, INC.,

        Defendant.
_____

**ORDER**

On March 13, 2006, the plaintiff, AT&T Corporation ("AT&T"), filed its amended complaint in this action alleging that the defendant, Midwest Paralegal Services, Inc. ("Midwest Paralegal"), owes $12,618.51 to AT&T for an unpaid invoice for long distance telephone service. AT&T asserts that, pursuant to AT&T Tariff F.C.C. No. 30 filed with the Federal Communications Commission ("FCC"), Midwest Paralegal is obligated to pay the amount owed for the unpaid invoice, plus interest and costs including attorney's fees. The charges accrued after an unauthorized user accessed Midwest Paralegal's telephone system and used AT&T's long distance telephone service to make six calls to the Philippines. Because the record viewed in the light most favorable to Midwest Paralegal would permit a reasonable juror to conclude that Midwest Paralegal was not a customer of AT&T within the meaning of AT&T Tariff F.C.C. No. 30, the court is obliged to deny AT&T's motion for summary judgment.

**BACKGROUND**

The facts underlying AT&T's amended complaint are largely undisputed. The incidents providing the factual basis for AT&T's allegations occurred between December 26 and December 28, 2004. Prior to the incidents in this case, Midwest Paralegal hired Wisconsin Communications, Inc., to install a telephone network, including a voice mail system and a Private Branch Exchange ("PBX"). A PBX is a customer-provided private switching system used to facilitate the transmission of telephone calls to, from, and within a place of business. The PBX and voice mail system operated on Midwest Paralegal's telephone network. Midwest Paralegal's telephone network allowed for a third party to call into and access the network from an outside telephone number. This feature allowed Midwest Paralegal's employees to access their voice mail messages when not in the office. Each extension was encrypted with a four-digit code that the caller would have to enter before accessing that extension's voice mail. The four-digit code was intended to protect each extension from unauthorized access.

Beginning at 12:59 a.m. on Sunday, December 26, 2004, and continuing through 6:10 p.m. on December 28, 2004, an unknown party accessed Midwest Paralegal's telephone network without the consent or authorization of Midwest Paralegal and made a total of six telephone calls on two of Midwest Paralegal's telephone lines ranging in duration from one minute to over ten hours. Over this three-day period, Midwest Paralegal incurred long-distance charges from AT&T in

2

the amount of $10,199.20, and fees in the amount of $2,419.31, for a total of $12,618.51.

AT&T provides telecommunications services to both its own customers who have presubscribed to AT&T's services as well as to "casual use" customers that utilize AT&T services through a local exchange company. AT&T's services permit a caller to access AT&T's network in order to make state-to-state and international calls even from a telephone line that is not presubscribed to AT&T as its primary interexchange carrier by dialing the AT&T carrier access code 1010288 (or 10-10-ATT). The cost of the state-to-state or international call is then billed to the telephone line from which the call was made.

AT&T is required to complete all calls that are placed over its network. Calls that are transmitted over to AT&T by local exchange companies serving a customer are indistinguishable from other calls placed over AT&T's network. AT&T cannot distinguish between customer initiated calls and calls that are placed over its network as the result of fraudulent use of a customer's PBX, or a customer of an local exchange company's PBX.

Midwest Paralegal did not utilize AT&T as its primary interexchange carrier in December 2004. The primary interexchange carrier for Midwest Paralegal during the relevant time frame was Sprint, Ltd., and its local exchange company was SBC (prior to the merger and/or acquisition involving AT&T). The person(s) who made the unauthorized calls accessed two of Midwest Paralegal's telephone lines by

3

decrypting the different four-digit codes that were assigned to each telephone line. Once these codes were decrypted, the caller, who was not an agent of Midwest Paralegal, accessed the AT&T carrier access code (10-10-ATT) and placed six telephone calls to the Philippines from Midwest Paralegal's telephone lines. AT&T did not design, install, or have any involvement in the choice, design, or installation of Midwest Paralegal's telephone network.

On Monday, December 27, 2004, AT&T left several voice mail messages for Midwest Paralegal indicating that it suspected fraudulent activity on Midwest Paralegal's telephone lines and suggesting that Midwest Paralegal secure its telephone lines. Midwest Paralegal was closed for business beginning December 24, 2004, through January 2, 2005. Due to the holiday hours, Midwest Paralegal did not receive these messages until Tuesday, December 28, 2004. Upon receiving these messages, Midwest Paralegal contacted AT&T to inquire about the problem. AT&T advised Midwest Paralegal that it was Midwest Paralegal's responsibility to secure the telephone lines to prevent any further fraudulent activity from occurring.

When Midwest Paralegal received an invoice from AT&T, Midwest Paralegal disputed the charges stemming from the fraudulent calls by notifying AT&T in writing within the six-month requisite time frame provided on the invoice and under AT&T Tariff F.C.C. No. 30 § 3.5.3(D). According to the tariff, in the event of a disputed charge, AT&T will exclude the disputed amount from the total balance while the

4

dispute is pending, and AT&T will apply a late payment charge only if it sustains the disputed charges after completing an investigation. *Id.* at § 3.5.4. AT&T, however, did not exclude the disputed amount from the total balance because it completed its investigation into the disputed charges in less than 48 hours from receiving notice of the dispute from Midwest Paralegal. After completing its investigation, AT&T concluded that pursuant to AT&T Tariff F.C.C. No. 30, Midwest Paralegal was liable for the principal amount of charges incurred as a result of the unauthorized use of its telephone system, along with interest on the unpaid balance at a rate of 18% per annum, and attorney's fees.

## ANALYSIS

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth

5

specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). In conducting its review, the court views all facts and draws all reasonable inferences in favor of the nonmoving party. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

AT&T asserts that there are no genuine issues of material fact and that it is entitled to judgment ordering Midwest Paralegal to pay the amount owed for the unpaid invoice plus interest and costs including attorney's fees. AT&T's claim for payment of the charges incurred as a result of the unauthorized use of Midwest Paralegal's telephone system rests upon a tariff filed by AT&T with the FCC, AT&T Tariff F.C.C. No. 30. Section 3.4.1(A) of AT&T Tariff F.C.C. No. 30 provides, in relevant part:

> The customer is responsible for placing any necessary orders and complying with tariff regulations for BTS [Business Telecommunications Service] and for assuring that its Users comply with tariff regulations. The Customer is also responsible for the payment of bills for BTS. This includes payment for BTS calls or services:
>
> - Originated at the Customer's number(s),
> - Accepted at the Customer's number(s) (e.g., Collect Calls),
> - Billed to the Customer's number via Third Number Billing if the Customer is found to be responsible for such call or service, or the use of a Company-assigned Special Billing Number, and
> - Incurred at the specific request of the Customer.

AT&T Tariff F.C.C. No. 30 § 3.4.1(A).

Tariffs filed by AT&T with the FCC govern the provision of long distance telecommunications services by AT&T. Indeed, the U.S. Supreme Court has held

6

that tariffs filed with the FCC are not mere contracts, but rather have the force of law. *See Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520 (1939). Under the filed tariff doctrine, a properly filed tariff "conclusively and exclusively control[s] the rights and liabilities between" a carrier and the carrier's customer. *Qwest Corporation v. AT&T Corp.*, 371 F. Supp. 2d 1250, 1251 (D. Colo. 2005) quoting *MCI Telecommunications Corp. v. Graphnet*, Inc., 881 F. Supp. 126, 132 (D.N.J. 1995). "The filed tariff doctrine presumes that customers know what the applicable tariff is" and prevents a "customer from enforcing claimed contract rights that contravene tariff provisions . . . . " *Qwest*, 371 F. Supp. 2d at 1251 citing *Marco Supply Co. v. AT&T Communications, Inc.*, 875 F.2d 434, 436 (4th Cir. 1989).

AT&T asserts that the terms of AT&T Tariff F.C.C. No. 30 require Midwest Paralegal to pay the principal amount of charges incurred as a result of the unauthorized use of its telephone system, along with interest and costs including attorney's fees. In support of this position, AT&T cites to *AT&T v. Jiffy Lube Int'l, Inc.*, 813 F. Supp. 1164 (D. Md. 1993), where the district court concluded that under the applicable AT&T tariff (AT&T Tariff F.C.C. No. 1), a customer of AT&T was liable for unauthorized charges due to third parties gaining access to the customer's telephone system. *Id.* at 1165. AT&T states that the circumstances in *Jiffy Lube* are similar to those in this case because in both cases, third parties gained access to the defendants' telephone systems and made unauthorized long distance calls over AT&T's telephone network. *See id.* In addition, the language of the tariff in *Jiffy*

7

*Lube* is substantially similar to the tariff at issue in the instant case. *See id.* at 1166; AT&T Tariff F.C.C. No. 30 § 3.4.1(A). The court in *Jiffy Lube* determined that the unauthorized calls at issue "originated" at Jiffy Lube's number and that Jiffy Lube, as an AT&T customer, was responsible for all calls made from its number, whether authorized or not. 813 F. Supp. at 1168. AT&T also cites to *AT&T v. New York City Human Resources Admin.*, 833 F. Supp. 962 (S.D.N.Y. 1993), where the district court held that the defendant was liable for calls made from its telephone system when an employee of the defendant manipulated its telephone system so that off-site callers could place unauthorized long distance calls through AT&T. *Id.* at 973-74.

AT&T states that Midwest Paralegal was a "casual use" customer, meaning that it was a "non-AT&T customer utilizing the AT&T network via" a local exchange company. (Eads Aff. ¶14.) AT&T asserts that "casual use" customers are subject to AT&T Tariff F.C.C. No. 30, and pursuant to sections 3 and 5 of the tariff, Midwest Paralegal is liable for payment of all calls or services that originated from its telephone system. *See* AT&T Tariff F.C.C. No. 30 §§ 3.4.1(A), 3.5.4, and 3.5.14. AT&T notes that it is undisputed that charges were incurred over AT&T's network when unauthorized third parties gained access to Midwest Paralegal's telephone system. Thus, AT&T asserts, pursuant to AT&T Tariff F.C.C. No. 30, Midwest Paralegal is liable for the charges originating from its number, plus interest and the costs, including attorney's fees, that AT&T has reasonably incurred in this matter.

8

In response, Midwest Paralegal contends that it is not subject to the terms of AT&T Tariff F.C.C. No. 30 because, Midwest Paralegal asserts, it does not qualify as a "customer" within the meaning of the tariff. Specifically, Midwest Paralegal asserts that section 3.4.1(A) of the tariff, which states that a customer is liable for payment of all calls or services that originate from that customer's number, does not apply to Midwest Paralegal because Midwest Paralegal was not a customer of AT&T. Section 3.10 of the tariff defines "customer" as "the person or legal entity which orders BTS [Business Telecommunications Service] (either directly or through an agent) and is responsible for payment of tariffed charges for services furnished to that Customer." AT&T Tariff F.C.C. No. 30 § 3.10. Midwest Paralegal asserts that because it never "ordered" BTS from AT&T, by the tariff's own definition, it was not a "customer" of AT&T. As such, Midwest Paralegal asserts, the tariff, the basis for AT&T's claim against Midwest Paralegal, does not apply to Midwest Paralegal.

Midwest Paralegal notes that the relationships between the parties in the cases cited by AT&T in support of its motion substantially differ from the relationship of the parties in this case. In the cases cited by AT&T, the party contesting the charges presubscribed to AT&T prior to the fraudulent calls being made. *See Jiffy Lube Int'l, Inc.*, 813 F. Supp. at 1165 (noting that AT&T provided Jiffy Lube with long distance telephone service); *New York City Human Resource Admin.*, 833 F. Supp. at 968 (noting that the defendant subscribed to AT&T's long distance telephone service). In other words, each of these parties had "ordered" AT&T service and was,

9

by definition, a "customer" of AT&T before the unauthorized calls were made over their telephone systems.

In the instant case, it is undisputed that Midwest Paralegal was not a presubscribing customer to AT&T service at the time the unauthorized calls were made. Midwest Paralegal's long-distance provider was Sprint, and its local exchange carrier was SBC. (Olley Aff. ¶ 8.) In addition, it is undisputed that the unauthorized caller who decrypted the code and accessed Midwest Paralegal's telephone network was not an agent of Midwest Paralegal. Therefore, Midwest Paralegal asserts, it did not "order" service from AT&T, either directly or through an agent, and was not, by the tariff's own definition, a "customer" of AT&T. *See* AT&T Tariff F.C.C. No. 30 § 3.10.

In support of this position, Midwest Paralegal cites to an FCC decision, *United Artists Payphone Corp. v. New York Tel. Co.*, 8 F.C.C.R. 5563 (August 18, 1993). The court notes that the FCC's interpretation of tariff provisions is afforded great deference because "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598 (1981). United Artists was a payphone company that provided approximately 550 payphones for public use in the New York City area. *United Artists*, 8 F.C.C.R. 5563, ¶ 2. To prevent unauthorized calls from being placed on the payphones, United Artists installed security features such as line screening, billed number screening, a service block to 10XXX access

10

code calls, and a block on all outgoing direct-dialed and operator-assisted dialing sequences for interstate and international calls. *Id.* Between early 1988 and December 1990, unauthorized callers gained access to United Artist's telephone lines and incurred approximately $1.4 million in charges to those telephone lines. *Id.* at ¶ 3. Those unauthorized calls utilized AT&T services, even though the payphones were not presubscribed to AT&T. *Id.* at ¶¶ 3, 6.

The tariff at issue in *United Artists*, AT&T Tariff F.C.C. No. 1, defines "customer" as, "the person or legal entity which orders LDMTS [Long Distance Message Telecommunications Service] (either directly or through an agent) and is responsible for payment of tariffed charges for services furnished to that Customer." *Id.* at ¶ 9. This definition is essentially identical to the definition of "customer" in the tariff in this case. *See* AT&T Tariff F.C.C. No. 30 § 3.10. The FCC in *United Artists* further defined "order" within the context of this definition as meaning, "an affirmative act by some 'customer' to establish a relationship with and receive service from AT&T, such as presubscription or some other act that would indicate an intention that AT&T service be available from UA payphones." *United Artists*, 8 F.C.C.R. 5563, ¶ 9. The FCC concluded that the payphone company, United Artists, was not liable for the disputed charges under the relevant AT&T tariff provisions because the "customer" for the fraudulent calls at issue was the end user, not United Artists. *Id.* at ¶¶ 11, 15. The FCC came to this conclusion after finding (1) that United Artists did not order direct-dialed service by presubscribing its payphone lines to AT&T, and

11

(2) United Artists took affirmative steps to control the unauthorized operator-assisted and direct-dialed calling and, by those steps, avoided constructively ordering service from AT&T. *Id.* at ¶¶ 11-15. Because United Artists did not intentionally or constructively order service from AT&T, the FCC held that United Artists was not AT&T's customer and could not be held liable under the provisions of the tariff. *Id.* at ¶ 15.

In the instant case, Midwest Paralegal asserts that the unauthorized caller was the "end user" of the AT&T service because the unauthorized caller was the party that "ordered" the service and, by doing so, became AT&T's customer. In *United Artists*, the FCC identified the "end user" as the person who placed the operator-assisted call and ordered service from AT&T through an affirmative act. *United Artists*, 8 F.C.C.R. 5563, ¶¶ 10-11. Therefore, in accordance with this holding, Midwest Paralegal asserts that it cannot be construed as AT&T's customer because it did not do anything to order service from AT&T, rather, the unauthorized user did.

Midwest Paralegal also asserts that, similar to United Artists, Midwest Paralegal (1) did not presubscribe its telephone lines to AT&T, and (2) took affirmative steps to control unauthorized calling and, by those steps, avoided "constructively ordering" service from AT&T. *See id.* at ¶¶ 13-15. Midwest Paralegal asserts that it did not "constructively order" service by establishing an inadvertent carrier-customer relationship with AT&T because it took reasonable steps to prevent

12

fraud on its telephone lines. Specifically, Midwest Paralegal protected its network with a four-digit access code. (Olley Aff. ¶ 4.) According to John Gierl ("Gierl"), the technician who installed the telephone network at Midwest Paralegal and serviced it after the fraudulent calls were made, access to Midwest Paralegal's network without authorization required an extremely high level of sophistication and knowledge about telecommunications. (Gierl Aff. ¶ 6.) Midwest Paralegal states that the call-in feature on Midwest Paralegal's telephone network is a standard feature on business telephone systems. (Gierl Aff. ¶ 4.) Midwest Paralegal asserts that these security measures were reasonable given that the system at issue consists of private telephone lines in the confines of Midwest Paralegal's office that were intended to be used in a business setting, especially when these measures are compared to those put in place by United Artists, who maintained approximately 550 public payphones in New York City. Thus, Midwest Paralegal contends, given that a reasonable juror could conclude that Midwest Paralegal was not a customer of AT&T within the meaning of the tariff because Midwest Paralegal (1) did not presubscribe its telephone lines to AT&T, and (2) took affirmative steps to control unauthorized calling and, by those steps, avoided "constructively ordering" service from AT&T, AT&T's motion for summary judgment should be denied.

In reply, AT&T maintains that Midwest Paralegal was a customer under the terms of the tariff because Midwest Paralegal "constructively ordered" telecommunications services from AT&T. Specifically, AT&T asserts that Midwest

13

Paralegal failed to adequately institute safeguarding measures to protect its telephone system. In support of this position, AT&T cites to *AT&T v. Community Health Group*, 931 F. Supp. 719 (S.D. Cal. 1995). In *Community Health Group*, AT&T filed a complaint to recover over $80,000 of long distance telephone charges that were incurred due to a "hacker" gaining access to the defendants' telephone system. *Community Health Group*, 931 F. Supp. at 721. The defendants did not presubscribe to AT&T services; rather, like Midwest Paralegal, the defendants subscribed to another carrier for long distance telephone service. *Id.* at 723. AT&T sought summary judgment, asserting that the defendants created an "inadvertent carrier-customer relationship" with AT&T by failing to adequately protect their telephone system from fraud. *Id.* The court concluded that the defendants failed to present any evidence that they took any protective measures to prevent unauthorized use of their telephone system. *Id.* The court stated:

> Defendants have presented no evidence that they or their equipment lessors took any steps to implement line-blocking features, institute an operator-screening service, undertake their own line-monitoring, or follow any of the other "affirmative safeguarding measures" that the FCC has recognized as a valid defense to a "constructive ordering" allegation. *E.g., United Artists Payphone Corp.*, 8 F.C.C.R. at 5566; *In the Matter of Atlantic Telco and Tel & Tel Payphones, Inc.*, 8 F.C.C.R. 8119, 8120 (1993). Defendants' declarants uniformly testified that no such protective measures were instituted until after AT&T contacted SYHC in October 1992 to inform SYHC of the unusual calling activity on its lines.

*Id.* Relying on *United Artists*, the court determined that because the defendants failed to take protective measures to prevent fraudulent use of their telephone

14

system, the defendants were AT&T's "inadvertent customer." *Id.* at 723-25.

AT&T asserts that Midwest Paralegal, similar to the defendants in *Community Health Group*, failed to adequately institute affirmative safeguarding measures to protect its telephone system from fraud and abuse. However, the circumstances in *Community Health Group* substantially differ from those in this case. In *Community Health Group*, the defendants failed to present any evidence "showing that they acted in any way to control the unauthorized charging of AT&T LDMTS calls to their system before the fraud occurred." *Id.* at 723. Here, Midwest Paralegal submits evidence demonstrating that, at the time the unauthorized calls occurred, its telephone network required a caller to enter a four-digit access code before the caller could access Midwest Paralegal's network remotely. (Olley Aff. ¶¶ 4-5.) In addition, Midwest Paralegal submits the affidavit of Gierl, the technician who installed and serviced Midwest Paralegal's telephone network. Suggesting that Midwest Paralegal took reasonable steps to secure its telephone system, Gierl stated that the call-in feature on Midwest Paralegal's telephone system was a standard feature in voice mail systems in business settings, and that based on his training and experience, the manner in which the unauthorized caller gained access to Midwest Paralegal's telephone system required an extremely high level of sophistication and knowledge in the telecommunications field. (Gierl Aff. ¶¶ 4, 6.)

Furthermore, in the other cases cited by AT&T, the party contesting the charges presubscribed to AT&T before the fraudulent calls were made. *See Jiffy*

15

*Lube Int'l, Inc.*, 813 F. Supp. at 1165 (noting that AT&T provided Jiffy Lube with long distance telephone service); *New York City Human Resource Admin.*, 833 F. Supp. at 968 (noting that the defendant subscribed to AT&T's long distance telephone service and that an employee of the defendant manipulated its telephone system so that off-site callers could place long distance calls through AT&T); *AT&T v. Intrend Ropes & Twines, Inc.*, 944 F. Supp. 701, 712 (C.D. Ill. 1996) (noting that the defendant subscribed to AT&T's long distance telephone service and "[s]ince Intrend could have taken steps to prevent unauthorized calling and did not, Intrend as the customer should bear the burden of paying for the unauthorized calls."); *Industrial Leasing Corp. v. GTE Northwest, Inc.*, 818 F. Supp. 1372, 1374 (D. Or. 1992) (noting that the plaintiff "ordered the 800 service, and so is AT&T's customer" and holding that the plaintiff was responsible for calls caused by remote access fraud); *Chartway Techs., Inc. v. AT&T Communications*, 6 F.C.C.R. 2952, ¶¶ 2, 12 (1991) (noting that the plaintiff subscribed to AT&T's long distance telephone service and held that the tariff "clearly impose[d] liability on subscribers for tariffed charges associated with 800 Service and LDMTS usage . . . . ").

Here, unlike the parties in the above cases, Midwest Paralegal did not presubscribe to AT&T. Because it is undisputed that Midwest Paralegal did not presubscribe to AT&T, and Midwest Paralegal submits evidence in support of its position that it took reasonable steps to secure its telephone system prior to the unauthorized use, a genuine dispute exists as to whether Midwest Paralegal was

16

AT&T's "customer." *See United Artists*, 8 F.C.C.R. 5563, ¶ 5. Indeed, a reasonable juror could conclude that the unauthorized user of Midwest Paralegal's telephone system, as the person who "ordered" AT&T's service, was the "customer" and is subject to the terms of the tariff. *See id.* at ¶¶ 9-11.

In conclusion, this case, distilled to its essentials, concerns whether Midwest Paralegal qualifies as a customer of AT&T within the meaning of the tariff. Viewing the facts in the light most favorable to Midwest Paralegal, as the court must, a reasonable juror could conclude that Midwest Paralegal was not a customer of AT&T within the meaning of the tariff because Midwest Paralegal (1) did not presubscribe its telephone lines to AT&T, and (2) took affirmative steps to control unauthorized calling and, by those steps, avoided "constructively ordering" service from AT&T. In light of the foregoing, AT&T's motion for summary judgment, which is premised on the belief that a juror could not reasonably arrive at this conclusion, must be denied. In light of the court's conclusion that a genuine dispute exists as to whether Midwest Paralegal was AT&T's customer, the court does not reach Midwest Paralegal's argument that even if it was found to be AT&T's customer, AT&T should be held accountable for a portion of the invoiced charges because AT&T failed to mitigate its damages by restricting, suspending, or discontinuing the service that it provided to the unauthorized user of Midwest Paralegal's telephone system.

Accordingly,

17

**IT IS ORDERED** that the plaintiff's motion for summary judgment (Docket # 13) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin this  7th   day of May, 2007.

BY THE COURT:

 s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge